**In re Mark G. GRAHAM, M.D., Debtor.**

**Harry S. CHERKEN, Jr., Lorna G. Cherken, Lindacarol Cherken Graham, Plaintiffs,**

**v.**

**Mark G. GRAHAM, M.D., Defendant.**

**Bankruptcy No. 95–17624DAS.
Adv. No. 95–0960DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 10, 1996.

Allen B. Dubroff, Philadelphia, PA, for Debtor.

Warren T. Pratt, Philadelphia, PA, for Plaintiffs.

Michael Kaliner, Fairless Hills, PA, for Trustee.

Arthur P. Liebersohn, Trustee, Philadelphia, PA.

Thomas E. Riley, Pittsburgh, PA, for Mellon Bank.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

### OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The Plaintiffs in the instant proceeding ("the Proceeding"), LINDACAROL CHERKEN GRAHAM, the estranged wife ("the Wife"); LORNA G. CHERKEN, the mother-in-law ("the Mother"); and HARRY S. CHERKEN, the brother-in-law ("the Brother"), respectively, of MARK G. GRAHAM, M.D. ("the Debtor"), challenge the dischargeability of the Debtor's respective indebtednesses to them. The Mother and the Brother rely on 11 U.S.C. § 523(a)(2)(A), as applied in *In re Van Horne*, 823 F.2d 1285 (8th Cir.1987). The Wife relies on the larceny prong of 11 U.S.C. § 523(a)(4) and the

alimony and support provisions of 11 U.S.C. § 523(a)(5). We conclude that the efforts of the Mother and Brother to shoehorn the instant facts into the *Van Horne* scenario are misplaced, and that the Debtor's use of the proceeds of stock held by the Wife as custodian for their children to pay joint tax debts cannot be characterized as larceny. Therefore, we render judgment in favor of the Debtor, except as to the uncontested claims of the Wife for alimony and support.

### B. FACTUAL AND PROCEDURAL HISTORY

The Debtor, a physician practicing internal medicine and rehabilitative medicine, filed the instant underlying individual voluntary Chapter 7 bankruptcy case on September 28, 1995. This case is being administered as an asset case by ARTHUR P. LIEBERSOHN, ESQUIRE, the Chapter 7 Trustee ("the Trustee"). Due to anticipated delays in the collection of the Debtor's assets, the Trustee has been accorded until May 1, 1997, to file the Final Audit papers in this case.

The Proceeding was filed on December 29, 1995. Also filed on that same day was another proceeding, brought by Mellon Bank, N.A. ("Mellon"), challenging the dischargeability of an indebtedness arising out of a loan in which the Debtor signed the Wife's name, allegedly without her permission, to a second mortgage on their jointly-owned former marital residence ("the Mellon Proceeding").

The trials of both dischargeability Proceedings were originally scheduled on February 13, 1996, but both were continued by agreement until March 7, 1996. On the latter date, Mellon and the parties to the instant Proceeding agreed to put off the trial of the Mellon Proceeding and those claims in the instant Proceeding relating to the execution of the second mortgage until the other claims in this Proceeding were resolved, initially to March 28, 1996. The remaining claims in this Proceeding were then tried on March 7, 1996.

At the close of the trial, the parties were accorded until March 28, 1996 (the Plaintiffs), and April 5, 1996 (the Debtor), to submit briefs in support of their respective positions.

Since this briefing was not completed until after March 28, 1996, the trials of the Mellon Proceeding and the related counts of this Proceeding were further continued until April 23, 1996.

The facts established at trial were as follows. The Debtor and the Wife were married approximately fourteen years ago. They have two sons, aged thirteen and six years, and the Debtor adopted the Wife's college-student daughter by a previous relationship. The Debtor testified that his income of over $275,000 in 1992 was severely adversely affected by 1993 state legislation changing the method of reimbursement for services related to workmens' compensation claims. The upshot of this legislation was the deterioration of the Debtor's previously-lucrative relationships with therapists in his occupational therapy practice, and delinquencies in federal tax payments.

In December 1993, the Debtor agreed, apparently with some reluctance, to allow the Brother, a partner in a large law firm, and colleagues and associates of that firm, to assume management of the family's financial affairs. In the course of this representation, the Brother learned that the Debtor had withdrawn about $60,000 from certain individual retirement accounts ("IRA's") to pay certain other business obligations, and that the family would suffer adverse tax consequences if these funds were not immediately replenished. The Brother therefore offered about $60,000 to the Debtor in personal loans, to which the Debtor, after some hesitation, agreed. The Brother then immediately applied his funds directly on these accounts.

The Debtor's financial difficulties persisted. In April 1994, the widowed Mother, who had always had a good relationship with the Debtor, loaned him an additional $30,000 towards the payment of the couple's federal income taxes. The Mother, in rather vague terms, contended that the Debtor had requested this loan from her. The Debtor, meanwhile, in rather vivid terms, indicated that the Mother insisted that he accept this loan after she observed his personal stress around the tax return deadline.

The final matter at issue concerned the sale of certain stock about the same time, in April 1994, held by the Wife in trust for the parties' children, which was valued at approximately $9,000. No details of the circumstances of the sale, explaining how the Debtor was able to sell stock of which the Wife alone was trustee, were provided. The only matters related to the transaction on which testimony was presented was the Wife's animated contention that she rejected the Debtor's request to sell this stock, and the Debtor's brief contrary testimony that, after discussing the matter, the Wife "acquiesced" in this sale. The proceeds of this sale were utilized by the Debtor to pay joint tax delinquencies of him and the Wife (referred to collectively hereinafter as "the Couple").

In August 1994, the Debtor left the marital residence without prior warning. On October 31, 1994, the Debtor sent an open letter to the Wife which purported to explain the reasons for his departure. The letter referenced a virtual cessation of sexual relations between the Couple since 1990, and pressure allegedly placed upon him by the Wife when his financial difficulties developed.

Much of the trial record was consumed with questioning of the Debtor, by the Plaintiffs' counsel, regarding various incidents of hotel visits and expenditures, mostly in 1993. The Debtor claimed that all of these incidents were business-related. The Plaintiffs wish us to draw the inference that the Debtor was involved in extramarital sexual relationships in these incidents, thereby supporting their contention that, like the *Van Horne* debtor, the instant Debtor anticipated his separation from the Wife at the time when he accepted the loans from the Mother and the Brother.

## C. DISCUSSION

### 1. THE DEBTOR'S INDEBTEDNESSES TO THE MOTHER AND THE BROTHER ARE NOT NONDISCHARGEABLE PURSUANT TO § 523(a)(2)(A).

The Mother and the Brother both rely upon 11 U.S.C. § 523(a)(2)(A) as the

basis for their claims that the Debtor's respective indebtednesses to them are nondischargeable. That Code section provides that

[a] discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— .

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

It is well-established that, to succeed in a § 523(a)(2)(A) claim, the plaintiff must prove, by a preponderance of the evidence, *see Grogan v. Garner,* 498 U.S. 279, 282–89, 111 S.Ct. 654, 656–61, 112 L.Ed.2d 755 (1991), each of the following five elements:

"(1) that the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made."

*In re Naimo,* 175 B.R. 878, 881 (Bankr. E.D.Pa.1994), *aff'd,* 1995 WL 163598 (E.D.Pa. April 6, 1995), quoting *In re Cirineo,* 110 B.R. 754, 757–58 (Bankr.E.D.Pa. 1990). *See also In re McDonald,* 177 B.R. 212, 215 (Bankr.E.D.Pa.1994); *In re Bergman,* 103 B.R. 660, 670–71 (Bankr.E.D.Pa. 1989); *In re Butler,* 86 B.R. 829, 830–31 (Bankr.E.D.Pa.1988); *In re Mistry,* 77 B.R. 507, 511 (Bankr.E.D.Pa.1987), *aff'd sub nom. Writer v. Mistry,* C.A. No. 87–6466 (E.D.Pa. Feb. 9, 1988); *In re Woods,* 66 B.R. 984, 988 (Bankr.E.D.Pa.1986); *In re Gelfand,* 47 B.R. 876, 879 (Bankr. E.D.Pa.1985); and *In re Brackin,* 23 B.R. 984, 985 (Bankr.E.D.Pa.1982).

*In re Bulei,* 1995 WL 431297, at *3 (Bankr. E.D.Pa. July 20, 1995). *See also, e.g., Van Horne, supra,* 823 F.2d at 1287; and *In re Guest, Union Nat'l Bank & Trust Co. v. Guest,* 193 B.R. 745, 747–48 (Bankr.E.D.Pa. 1996).

The only case cited by the Plaintiffs, in their post-trial oral argument and post-trial brief, in support of these claims is *Van Horne, supra.* In that case, the debtor executed a renewal of a previous loan from his mother-in-law in the amount of $28,000 on August 10, 1982. 823 F.2d at 1286. By August 27, 1982, the debtor had both moved out of his family home and filed a divorce action against the plaintiff's daughter. Given this extremely close juxtaposition of the loan renewal and the debtor's actions to sever the marriage, the appeals court affirmed the bankruptcy court's disbelief of the debtor's insistence that he did not intend to end his relationship with the plaintiff's daughter when he renewed the loan. *Id.* at 1288.

In the instant factual setting, the loans from the Brother and the Mother were made in December 1993 and April 1994, respectively. The Debtor did not separate from the Wife until August 1994, or commence divorce proceedings against her until September 1994. The distinction between the very short lapse of time from the family loan to the separation/divorce in *Van Horne,* and the period of several months in issue here, is, in our view, very significant. There is no extrinsic evidence to support the notion that the Debtor contemplated separation/divorce from the Wife when he obtained the loans in question from his in-laws.

We thus find that the Debtor's denials of an intention to separate from the Wife when the loans were advanced to him by the Mother and the Brother were credible. Certainly, the record is a far cry from supporting what the *Van Horne* trial court concluded were patently transparent denials of such an intention on the part of that debtor.

Perhaps recognizing the significance of the distinctions in the instant facts from those of *Van Horne,* the Plaintiffs attempt to emphasize (1) certain passages in the open letter of October 31, 1994; and (2) innuendos that the Debtor was involved with other women in his 1993 hotel visits, in support of their claims that the Debtor had formed an intention to

leave the Wife which he concealed from them when he accepted the loans from his in-laws. Neither of these references support this conclusion.

With respect to the letter, the Plaintiffs emphasize those passages indicating the marital problems between the Debtor and the Wife were longstanding, extending back well before April 1994 and December 1993. While this conclusion is perhaps true, it is also true that, as of the earlier dates, the Debtor did not choose to leave. No event precipitating the Debtor's departure was suggested on either side. It therefore appears that, while the problems between the Couple may have existed for some time, they did not add up to the Debtor's departure from the marital home prior to August.

The intimate marital problems of the couple referenced in the letter, which the Wife did not deny in her brief testimony, were not the sort that one would expect a husband to reveal to his in-laws. What strikes us as most inappropriate about the letter is that they were disclosed at all.

The recitation of the Debtor's hotel visits and expenditures for massages and alcoholic beverages from his mini-bars adds up to no more than a series of unrelated non-events. Perhaps if there were evidence that the Debtor formed a relationship with another woman in 1993 whom he joined after he left the Wife in 1994, we might have been able to infer a connection between these innuendos and deception of the Plaintiffs. However, no such connection was made. In sum, this "evidence" provides little impact and represents merely a failed attempt to inflame the court against the Debtor. The emphasis given to this inconclusive soap-operatic scenario ultimately emphasizes only the weakness of any solid evidence of the Debtor's prior intention to leave the Wife.

Additional facts also support the conclusion that the Plaintiffs' reliance on § 523(a)(2)(A) is misplaced. First, the Brother's loan to the Debtor was admittedly not initiated by the Debtor, and we doubt that the loan from the Mother was made much differently. This factor belies the presence of any scheme of the Debtor to fraudulently obtain funds from the in-laws. Second, the proceeds of both loans were used for their intended purposes of replenishing the parties' IRA's and paying off the Couple's tax liabilities, respectively, both of which purposes benefitted the Wife, the Debtor, and their marital entity. A philandering husband bent on deception about the strength of his marital relationship is unlikely to have used the proceeds for strictly such purposes. Finally, the Debtor made a substantial pre-petition settlement offer to the in-laws. The *Van Horne* debtor made no such attempts nor overtures at repayment.

For all of these reasons, we conclude that it has not been proven, by a preponderance of the evidence, that the Debtor materially misrepresented the stability of his marital relationship to the in-laws at the time that the loans in issue were made. As we noted in *Bulei, supra,* at *4, the Plaintiffs' failure to satisfy the first and most crucial § 523(a)(2)(A) element of proving existence of a "misrepresentation" makes it difficult to analyze the remaining four elements identified at page 371–72 *supra*. That is to say, if there is no proof of misrepresentations of facts by the Debtor to begin with, it cannot be said that any knowingly false, intentionally deceptive misrepresentations were made, or that creditors relied upon and suffered damages as the result of any such misrepresentations. Consequently, we conclude that the Plaintiffs' claims under § 523(a)(2)(A) must fail.

2. *THE DEBTOR'S INDEBTEDNESS TO THE WIFE IS NOT NONDISCHARGEABLE PURSUANT TO THE LARCENY PRONG OF § 523(a)(4).*

■ The Wife asserts that the Debtor's sale of their children's stock, of which she was the trustee, and use of the proceeds to pay the Couple's tax debts, in the face of her express objection to his doing so, violated the larceny prong of 11 U.S.C. § 523(a)(4). Section 523(a)(4) provides that

[a] discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

As in the case of the § 523(a)(2)(A) claims, regarding which *Van Horne* is cited as the only supporting precedent, the Wife relies on only one precedent in support of her claim, *In re Burgess,* 106 B.R. 612, 622 (Bankr. D.Neb.1989). *Burgess* is referenced for its definition of "larceny." The Plaintiffs paraphrase, in slightly milder terms, the definition set forth in that case: "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Id. Accord, e.g., In re McCurdy,* 45 B.R. 728, 732 (Bankr. M.D.Pa.1985).

The evidence presented by the Wife regarding this particular claim is confined to establishing that the sale of the stock took place, which is not contested, and her detailed recitation of a conversation between her and the Debtor in which the Debtor requested permission from her to sell the stock, which she emphatically refused to give. The Debtor denies the refusal of permission. From the Debtor's relatively blank recitation of this encounter, we are more inclined to believe the Wife's version.

However, our acceptance of the Wife's version of this encounter establishes only that the sale was undertaken despite the Wife's wishes to the contrary. The record is silent on the other pertinent aspects of this transaction, most notably how the Debtor was able to effect the sale at all when he was not the owner of the stock. In post-trial argument, raising matters not of record, the Debtor's counsel suggested that a relative of the Wife made the transfer. We of course cannot consider matters not of record, but we must emphasize that all that the Wife has proven is that she did not consent to the sale. The question presented is whether that fact, alone, establishes all of the elements of larceny, as referenced in § 523(a)(4)

We find that it does not. The property in issue was used to pay a tax liability which was imposed on the Couple together and, consequently, on the entire family. The stock was therefore not taken for the taker's own use, but for the use of a joint obligation of the taker, the trustee, and the beneficiaries of the property. Therefore, it cannot be said that the Debtor acted with the intent to convert the stock exclusively to his own use. There is also considerable doubt in our mind as to whether the Debtor could be said to be acting fraudulently or with a wrongful intent, even if he could be found to have taken the stock wrongfully.

■ The case law interpreting the "larceny" prong of § 523(a)(4) establishes that the "fiduciary capacity" requirement need not be satisfied for this ground of nondischargeability to prevail. *See In re Shervin,* 112 B.R. 724, 735 (Bankr.E.D.Pa.1990). Therefore, the Plaintiffs' failure to establish that the Debtor was acting in a fiduciary capacity when he cashed the stock was not fatal to this claim. However, the larceny prong of § 523(a)(4) is nevertheless a difficult ground to successfully sustain. In *Burgess,* the only case cited by the Plaintiffs in support of this claim, this ground for dischargeability was *not* sustained, despite that claims based on the "fiduciary capacity" and "embezzlement" prongs of § 523(a)(4) *were,* due to a finding that the debtor's initial taking of the property in issue was found not unlawful. 106 B.R. at 619–22. Similarly, in *In re Barrett,* 156 B.R. 529, 533 & n. 3 (Bankr.N.D.Tex.1993), the court found an indebtedness nondischargeable under the "fiduciary capacity" prong of § 523(a)(4), but not under the "larceny" prong, due to the plaintiff's failure to establish a fraudulent intent of the debtor when he effected a misappropriation of the plaintiff's property. The respective courts in *In re Langworthy,* 121 B.R. 903, 907–08 (Bankr.M.D.Fla.1990); and *In re Wilson,* 114 B.R. 249, 252–53 (Bankr.E.D.Cal.1990), refused to find "larceny" despite their respective conclusions that the debtors effected conversions of property because of a lack of evidence that the respective debtors had specific intentions to defraud. The Debtor's use of the stock proceeds for payment of joint tax debts negates the presence of an intent of the Debtor to defraud the Wife.

We observe that, in most of the few cases finding nondischargeability on the basis of "larceny," the decisions were preceded by an

earlier state court decisions supporting these conclusions. *See In re Rose*, 934 F.2d 901, 902–04 (7th Cir.1991) (debtor found by the state court to have stolen the plaintiff's money); *In re Lavita*, 150 B.R. 3, 4 (Bankr. D.Mass.1993) (debtor admitted facts to support a state court decision that he was guilty of larceny); *In re Kelly*, 155 B.R. 75, 77 (Bankr.S.D.N.Y.1993) (debtor convicted of grand larceny in state court); and *In re Sokol*, 170 B.R. 556, 558 (Bankr.S.D.N.Y. 1994), *aff'd*, 181 B.R. 27 (S.D.N.Y.1995) (same). We therefore conclude that neither the facts nor the caselaw support a decision that the Debtor's potential liability to the Wife or his children (who are not plaintiffs) arising from his sale of the stock in issue is nondischargeable.

3. *THE DEBTOR'S ALIMONY AND SUPPORT LIABILITIES TO THE WIFE ARE ADMITTEDLY NON-DISCHARGEABLE.*

The Debtor has not contested the Wife's claims that his alimony and support liabilities to her are nondischargeable. We note, however, that the Wife has made no further claims under 11 U.S.C. § 523(a)(15), the new Code provision allowing certain property settlement claims to be declared nondischargeable.

## D. CONCLUSION

An Order will be entered rendering judgment in the Debtor's favor on the contested issues, declaring all of the debts in question to be dischargeable except the uncontested claim that alimony and support owing to the Wife is nondischargeable.